IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 23, 2001

## CHRISTOPHER STACY LONG v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 99-CR-219     James Edward Beckner, Judge**

**No. E2000-01909-CCA-R3-PC**
**July 19, 2001**

The Petitioner pled guilty to first degree felony murder and to forgery, receiving concurrent sentences of life with the possibility of parole and one year's incarceration, respectively. The Petitioner subsequently petitioned the trial court for post-conviction relief. Following an evidentiary hearing, the trial court denied post-conviction relief. The Petitioner now appeals this decision. He argues that he received ineffective assistance of counsel when he entered his pleas of guilty, causing him to enter his pleas involuntarily and unknowingly. Having reviewed the record, we conclude that the Petitioner's representation was not deficient and thus affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Scott A. Hodge, Morristown, Tennessee, for the appellant, Christopher Stacy Long.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Chris Scruggs, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

On October 27, 1998, the Petitioner, Christopher Stacy Long, pled guilty to first degree felony murder and to forgery. Pursuant to his plea agreement, he received concurrent sentences of life with the possibility of parole for the murder conviction and one year's incarceration for the forgery conviction. On June 18, 1999, the Petitioner filed a pro se petition for post-conviction relief. See State v. Christopher Stacy Long, No. E1999-01205-CCA-R3-CD, 2000 WL 79357, at *1 (Tenn. Crim. App., Knoxville, June 21, 2000). While the petition was pending, counsel for the Petitioner filed a motion to dismiss the petition, stating that upon review of the petition with counsel, the

Petitioner had concluded that the pro se petition was without merit. Id. The trial court granted the motion and dismissed the petition for post-conviction relief. Id.

On October 11, 1999, the Petitioner filed a second petition for post-conviction relief. Id. The trial court summarily dismissed the petition, stating that the petition was exactly the same as the pro se petition that had been previously dismissed. Id. The Petitioner subsequently appealed the summary dismissal of his second petition for post-conviction relief. Id. On appeal, this Court reversed the judgment of the trial court and remanded for an evidentiary hearing on the Petitioner's second petition for post-conviction relief. See id.

On August 1, 2000, the trial court conducted an evidentiary hearing pursuant to the order of this Court and denied post-conviction relief. It is this decision that the Petitioner now appeals, arguing that he received ineffective assistance of counsel at his guilty plea proceeding and that he therefore did not enter his pleas knowingly and voluntarily. Upon review of the record, we conclude that the trial court did not err by denying post-conviction relief and thus affirm the judgment of the trial court.

At the post-conviction hearing, the Petitioner stated that he was twenty-six years old. He testified that he was represented by his trial attorney for nine months before he pled guilty and stated that he met with his attorney five times during this period. The Petitioner claimed that he first met with his attorney a couple of months after being charged with the crimes in this case, and he claimed that after this first meeting, he did not meet with his attorney again until two months later. He recalled that during their second meeting, he and his attorney discussed the evidence against him and "[went] over a lot of the paperwork." He testified that his attorney "explained to [him] that [he] was charged with first degree murder, a forgery, a life sentence with the possibility of parole." The Petitioner maintained that his attorney failed to explain to him the type of first degree murder with which he was charged.

The Petitioner stated that he met with his attorney a third time approximately two months after their second meeting. The Petitioner described the third meeting as follows: "He came to me and discussed a plea agreement, and told me that the district attorney had told him that I could either take sixty years at thirty percent or I would go to trial and it would be possible that I would get the death penalty." The Petitioner recalled that his attorney contacted him a couple weeks after the offer was made and asked him whether he wished to accept the offer. The Petitioner responded that he needed more time to consider the offer. After another week, according to the Petitioner, the attorney again contacted the Petitioner, and at this time, the Petitioner told his attorney that he feared the death penalty and therefore wished to accept the State's offer. The Petitioner testified that during this final meeting, he and his attorney discussed the charges and the sentences he was to receive pursuant to the plea agreement.

The Petitioner reported that on the day before the plea, he met with his attorney, who informed him of the questions that the court would read to him prior to accepting his plea. The Petitioner stated that he told his attorney that he could not read well, so his attorney read the

questions to him. The Petitioner testified, "[H]e told me to say yes, sir, or no, sir, to that question."

The Petitioner testified that on the day of the plea, he was "scared to death." He stated, "I was just yes, sir, yes, sir, yes sir, just trying to get it over with. I was scared, frightened. I got a wife, two kids; I didn't want to go to trial and get [the] death penalty. So . . . I just said, well, I'm just going to go up there and say . . . whatever I'm supposed to say and just get it over with." The Petitioner recalled that on the day of the plea, the court first explained to him the elements of premeditated first degree murder, but later corrected itself and explained to him that he was charged with felony murder, specifically murder in the perpetration of a theft. The Petitioner stated that this confused him, but he "wanted to get it over with."

The Petitioner was presented with copies of the "Waiver of Rights and Plea of Guilty" and the "Negotiated Plea Agreement" at the post-conviction proceeding, and he acknowledged that he had signed the documents. However, he claimed that he had entered into the plea agreement believing that he would be eligible for parole after eighteen years. He explained that he believed he was to receive a life sentence of sixty years with release eligibility after service of thirty percent, which he calculated to be eighteen years. He claimed that his attorney explained this to him and told him he "would get thirty percent because [he] was a first time offender."

The Petitioner also maintained that he was confused by the format of the "Waiver of Rights and Plea of Guilty" and "Negotiated Plea Agreement" forms. The "Waiver of Rights and Plea of Guilty" form includes the following language: "The sentence I will receive is: LIFE SENTENCE (with a possibility of parole) for First Degree Murder; 1 YEAR TO FORGERY- CONCURRENT with a 30% R.E.D." The "Negotiated Plea Agreement" form listed the following under "Term of Sentence": "Life with possibility of parole; 1 year at 30%" and on the following line, "concurrent." The Petitioner maintained that he believed the "30%" applied to both his forgery and first degree murder convictions. The Petitioner claimed that he first learned that he must serve the sentence at one hundred percent when he arrived at the prison where he was to be incarcerated.

On cross-examination, the Petitioner was asked why he believed that his sentence for first degree murder was to be sixty years, and he responded, "T.D.O.C. policy." However, when reminded that he was not incarcerated at the time he was sentenced, he responded that his attorney told him "they changed the law in '96. . . . He said that it went . . . somewhere from thirty-two to thirty-six years to sixty years . . . ." The Petitioner also admitted that he told the court on the day of the guilty plea proceeding that he could read and write. However, at the post-conviction hearing, he maintained, "I can read but I have a learning disability that I can't comprehend what I read as soon as I read it." When asked whether he recalled the court telling him that he would have to serve a minimum of fifty-one years in prison before being eligible for release, he responded, "I don't exactly remember that being said, but it probably was said."

The Defendant's attorney testified that he had been practicing law for twenty-six years, eleven of which he had served as a criminal prosecutor. He stated that he was a private attorney at the time he represented the Petitioner and at the time of the post-conviction hearing. The attorney

testified that during his representation of the Petitioner, he met with the Petitioner nine times, and he recalled that the interviews "ranged from anywhere as short as four-tenths of an hour to two plus hours." He stated that he also met with members of the Petitioner's family an additional nine or ten times.

The attorney testified that the possible sentences in the Petitioner's case for the charge of first degree murder were life with the possibility of parole and life without the possibility of parole. He stated, "No death penalty notice was ever filed by the state of Tennessee to the best of my recollection . . . . ," but he recalled that the State did file a notice of intent to seek the penalty of life without parole in the Petitioner's case. The attorney also recalled that the range of punishment for the forgery charge was between one and two years. He stated that the Petitioner, as a Range I offender, would be eligible for parole for the forgery conviction after service of thirty percent of his sentence. However, the attorney reported that the thirty percent release eligibility date applied to the forgery conviction only.

The attorney testified that in preparation for the Petitioner's case, he consulted with a colleague who was formerly employed as a public defender and who was very experienced in defending first degree murder cases. In addition, he testified that he conducted careful research concerning the actual time that the Petitioner would have to spend in prison if he accepted an offer of life with the possibility of parole, and he concluded that the Petitioner would have to spend fifty-one years in prison before being eligible for parole if he accepted such an offer. The attorney maintained that he "never made any mention about any sixty years or any thirty percent of any sixty years." He stated, "I always told [the Petitioner] that a life sentence with the possibility of parole, that my research reflected that he was going to serve fifty-one years. I told him I confirmed that with knowledgeable people."

The attorney further testified that while preparing for the Petitioner's case, he was in "constant contact" with the District Attorney's office, "practically on a weekly basis, perhaps even more than that." He recalled that he reviewed with the Petitioner "all of the discovery material, after . . . interview[ing] all of the witnesses that were contained in the indictment, including all of the detectives, the sheriff, other witnesses that the state intended to produce at trial, and also after . . . [speaking] with all . . . potential" defense witnesses. The attorney stated that after conducting research and investigating the case, he "could see the strength of the state's case" and therefore asked the Petitioner for permission to enter into plea agreement negotiations with the State.

The attorney testified that he explained the plea agreement forms to the Petitioner prior to the guilty plea proceeding. He maintained that he explained to the Petitioner that he was to receive a one-year sentence for the forgery conviction, with a thirty percent release eligibility status, and a life sentence for the first degree murder conviction, which was to run a minimum of fifty-one years. With regard to the "Waiver of Rights and Plea of Guilty" and "Negotiated Plea Agreement" forms, which the Petitioner claimed he found to be confusing, the attorney pointed out that on both forms, a semi-colon separated the two separate sentences listed on the forms. On cross-examination, he stated that he "didn't recall that [he and the Petitioner] had any specific conversation about the semi-

colon," but he maintained that he explained both sentences to the Petitioner. He stated that he believed that on the day the Petitioner pled guilty, the Petitioner understood the charges against him and the sentences for those charges.

On cross-examination, the attorney testified that he recalled a mistake the court made at the guilty plea proceeding. He stated that the court initially questioned the Petitioner about the elements of premeditated first degree murder. He admitted that he did not realize that the court had made the mistake until the District Attorney pointed it out. He recalled that the court quickly corrected its mistake and began to question the Petitioner about the elements of felony murder, the crime with which the Petitioner was charged. The attorney stated that he "didn't think the [Petitioner] was confused" by the mistake. He maintained, "Everybody was clear about the facts; it was a felony murder."

The Defendant now contends that he is entitled to post-conviction relief because he received ineffective assistance of counsel, resulting in involuntary and unknowing guilty pleas. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001) (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). A post-conviction court's conclusions of law, such as whether counsel's performance was deficient or whether that deficiency was prejudicial, are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result, id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).

This standard also applies to claims arising out of the plea process. Hill v. Lockhart, 474 U.S. 52, 58 (1985). To satisfy the requirement of prejudice in a case involving a guilty plea, the

petitioner must demonstrate a reasonable probability that, but for counsel's errors, he or she "would not have pleaded guilty and would have insisted on going to trial." Id at 59; see also Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

At the conclusion of the hearing, the post-conviction court made the following findings of fact:

In this case particularly the record will show unequivocally that [the Petitioner's trial attorney] made a thorough preparation for trial, that he discussed all things with the [Petitioner] at great length. . . . That he literally left no stone uncovered in making a determination as to what should be done. He did make suggestions, recommendations, and give advice to the [P]etitioner as to what should be done.

The state filed a notice of punishment involving life without parole, substantially greater deprivation of liberty than life with parole. When the state offered life with parole, [the Petitioner's attorney] discussed it at length and exhaustively with the [P]etitioner.

It was a wise decision on the [P]etitioner's part to choose that, because a trial could easily have . . . produced the greater enhanced punishment.

There can be no doubt that the [P]etitioner understood the consequences of the plea. There can be no doubt that the [P]etitioner understood that life imprisonment with the possibility of parole meant 51 years. The allocution clearly demonstrates that, and the Court's questioning and allocuting the [P]etitioner, the discussions with the victim's family, the discussion with [the attorney]. I find for the record unequivocally that [the attorney] never advised the [P]etitioner at any time that he would be released any time sooner than 51 years for the life sentence. It's clear that was the case.

Now, something kind of unusual did happen during the course of the allocution. As it was pointed out, this case was brought before me for a plea in another county unexpectedly, and I had little or no time to look at the file prior to taking the plea. And I originally allocuted the [P]etitioner on premeditated first degree murder rather than felony murder. As has been pointed out, everyone knew that it was felony first degree murder. The [P]etitioner did answer questions about

-6-

those and answered affirmatively that he understood those to be the elements of the offense. . . .

I remember the plea, and I remember that the [P]etitioner was alert and understood what was asked of him. It was not a "yes, sir" to everything. As a matter of fact, on some occasions the allocution will reflect that the [P]etitioner asked this Court to repeat the question, and there were times when the [P]etitioner misunderstood a question and it had to be explained on one or two occasions, and he asked that it be explained, and there were times that he said "no" where the appropriate answer was no.

Without any question, this record and this testimony here today shows that the plea was voluntary and understandably and intelligently entered in all respects.

And it also shows that [the attorney] provided effective assistance of counsel if not superior assistance of counsel in every phase of his representation of [the] [P]etitioner.

We conclude that the record does not preponderate against these findings by the trial court. The Petitioner has failed to demonstrate that his counsel's performance was deficient or that he entered his guilty pleas involuntarily or unknowingly. Having reviewed the record, we conclude that the advice and services rendered by the Petitioner's attorney were well within the range of competence demanded of a criminal defense attorney, see Baxter, 523 S.W.2d at 936, and thus that the Petitioner was fully informed when he entered his plea. However, even assuming that the performance of the Petitioner's attorney was deficient, we are unconvinced that but for his counsel's errors, the Petitioner "would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59; see also Bankston, 815 S.W.2d at 215. A defendant charged with first degree murder faces three possible sentences: death, imprisonment for life without the possibility of parole, and imprisonment for life. See Tenn. Code Ann. § 39-13-202(c)(1)-(3). Although the State did not seek the death penalty in this case, the State did file a "Notice of Intention to Seek Penalty of Life Without Parole." Despite being faced with what his attorney characterized as a strong case by the State,[1] the Petitioner received the least of these penalties.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

---

[1] The Petitioner's trial attorney testified,

The facts were clear. This was done in the perpetration of a robbery. [The Petitioner] had stolen a credit card; he had stolen checks; he had cashed them the next day. The victim was found with a stab wound to his chest. The knife was wrapped in some type of blue shirt or blue towel and hidden either in a garage or an outbuilding next to the house.